FILED

09/23/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0368

DA 23-0368

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 215

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

CHARLES WILLIAM POST,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DC 22-155
Honorable Jennifer B. Lint, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Tammy A. Hinderman, Appellate Defender Division Administrator,
Gregory Hood, Assistant Appellate Defender, Helena, Montana

      For Appellee:

            Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

            William E. Fulbright, Ravalli County Attorney, Amanda Smith, Deputy
County Attorney, Hamilton, Montana

Submitted on Briefs: August 13, 2025

Decided: September 23, 2025

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Charles Post (Post) appeals from the judgment entered by the Twenty-First Judicial District Court, and challenges the fees, costs, and fine imposed in his sentence. We consider:

> *Did the District Court err by imposing fees and costs not included in the oral pronouncement of sentence and by failing to consider the Defendant's ability to pay fees and fines?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Post was cited for DUI (third offense) and driving with a suspended license (DWS) on November 26, 2021, both misdemeanor offenses.[1] He was convicted of both offenses in Justice Court, and appealed for a trial de novo in District Court. On April 17, 2023, a district court jury convicted Post of both offenses. *See* §§ 61-8-1002(1)(b), 61-5-212, MCA. The District Court held a sentencing hearing on April 20, 2023. At sentencing, Post's counsel stated:

> We will leave the sentencing to the Court's discretion. We would just like to argue about fines and fees. . . . Mr. Post is still trying to pay off fines and fees for his second DUI that he pled guilty to last year. In addition, he is on a limited income. He is on disability and social security. He does not have the means to make consecutive—like fines with consecutive amounts. And so we would just ask the Court take that into consideration, in addition to waiving the public defender's fees.

---

[1] Because the crime was committed in 2021, all references to statute herein are to the 2021 Montana Code Annotated (MCA). *See State v. Stoner*, 2012 MT 162, ¶ 12, 364 Mont. 465, 285 P.3d 402, (we apply "the law in effect at the time a crime was committed"). However, in 2021, §§ 61-8-401, et al., MCA, were repealed and renumbered at § 61-8-1002, MCA. *See* 2021 Mont. Laws ch. 498, § 4. The sentencing statutes for DUI offenses were also repealed and renumbered. *See* §§ 61-8-1001, et. al., MCA. For the reader's convenience, we cite to the renumbered sections within Title 61, MCA (2021).

2

The District Court expressed concern about defendants manipulating the de novo appeal procedure to attempt to obtain a lesser sentence, and did not inquire further into Post's financial situation, moving directly to sentencing. "[T]his isn't to suggest that I don't look at each case individually," said the District Court, "but it is to discourage any forum shopping." For the DUI, the District Court orally sentenced Post to 360 days in the Ravalli County Detention Center, with 330 days suspended and credit for four days served. The District Court also imposed a "$3,000 fine with the statutory surcharges," plus a $250 public defender fee. For DWS, the District Court sentenced Post to six months with all but two days suspended to run concurrently to the DUI sentence. Post's written judgment, filed May 23, 2023, included a breakdown of Post's "Financial Obligations," as follows:

### FINANCIAL OBLIGATIONS

| To Be Paid to the Ravalli County District Clerk of Court: | |
| --- | --- |
| Fine: | $3,000.00 |
| Total Statutory Surcharge Fee: | $30.00 |
| Total Court Technology Fees: | $10.00 |
| Prosecution Costs | $50.00 |
| Repayment of Public Defender Fees, to be paid directly to OPD | $250.00 |
| **TOTAL FINANCIAL OBLIGATION** | **$3,340.00** |

Post appeals, claiming the written judgment conflicts with the oral pronouncement of his sentence, and that the District Court failed to consider his ability to pay the $3,000 fine, $250 public defender fee, and $30 in statutory surcharges.

STANDARD OF REVIEW

¶3 This Court reviews sentences for legality, "confining our review to whether the sentence falls within the parameters set by statute." *State v. Kalina*, 2025 MT 70, ¶ 53, 421 Mont. 305, 567 P.3d 270 (citing *State v. English*, 2006 MT 177, ¶ 55, 333 Mont. 23, 140 P.3d 454). We review de novo whether a district court adheres to the applicable sentencing statute. *State v. Dowd*, 2023 MT 170, ¶ 6, 413 Mont. 245, 535 P.3d 645.

## DISCUSSION

¶4 *Did the District Court err by imposing fees and costs not included in the oral pronouncement of sentence and by failing to consider the Defendant's ability to pay fees and fines?*

¶5 When an oral sentence and written judgment are in conflict, the "sentence that is 'orally pronounced from the bench in the presence of the defendant is the legally effective sentence and valid, final judgment.'" *State v. Calahan*, 2023 MT 219, ¶ 27, 414 Mont. 71, 538 P.3d 1129 (quoting *State v. Lane*, 1998 MT 76, ¶ 40, 288 Mont. 286, 957 P.2d 9). The $10 technology fee and $50 in prosecution costs were not part of Post's orally imposed sentence, and thus the State concedes that Post's judgment should not include these fees.

¶6 The State further concedes that the District Court failed to conduct an inquiry into Post's ability to pay the $250 public defender fee. Section 46-8-113(1), MCA, states that a sentencing court "shall determine whether a convicted defendant should pay the costs of counsel assigned to represent the defendant." Interpreting statutes, we have instructed that the words "'shall' and 'must' are 'mandatory, rather than permissive.'" *State v. Knowles*, 2025 MT 107, 422 Mont. 70, 569 P.3d 184 (citing *State v. Kortan*, 2022 MT 204, ¶ 21, 410 Mont. 336, 518 P.3d 1283 (quoting *Montco v. Simonich*, 285 Mont. 280, 287, 947 P.2d

4

1047, 1051 (1997))). In *State v. Moore*, 2012 MT 95, ¶ 14, 365 Mont. 13, 277 P.3d 1212, we said the district court must "demonstrate a serious inquiry or separate determination" into the defendant's ability to pay the costs of appointed counsel (quoting *State v. McLeod*, 2002 MT 348, ¶ 34, 313 Mont. 358, 61 P.3d 126). Based on the sentencing record, included as quoted above, we conclude the District Court did not inquire into Post's ability to pay the $250 public defender fee and, therefore, failed to make the necessary determination.

¶7    The remaining question is whether the District Court similarly erred when it did not inquire into Post's ability to pay the $3,000 fine and $30 in statutory surcharges. A third DUI is punishable "by a fine of not less than $2,500 or more than $5,000." Section 61-8-1007(a)(iii), MCA. The State argues that a $3,000 fine is well within the statutory limits for sentencing a person convicted of DUI (third offense), and that the District Court was not required to waive the misdemeanor surcharges. Post contends the District Court was statutorily and constitutionally obligated to inquire into his ability to pay the fine and surcharges.[2]

¶8    Section 46-18-231(3), MCA, provides:

> The sentencing judge may not sentence an offender to pay a fine unless the offender is or will be able to pay the fine and interest. In determining the amount and method of payment, the sentencing judge shall take into account the nature of the crime committed, the financial resources of the offender, and the nature of the burden that payment of the fine and interest will impose.

---

[2] The State dedicates much of its appellate briefing to defending the constitutionality of the fine for DUI (third offense), and asking for any ruling to the contrary within *State v. Gibbons*, 2024 MT 63, ¶ 64, 416 Mont. 1, 545 P.3d 686, to be overruled. However, in reply, Post clarifies he "has not challenged the facial constitutionality of any statute" and is relying upon statute.

5

Regarding surcharges, § 46-18-236(1), MCA, states: "there must be imposed by all courts of original jurisdiction on a person upon conviction for any conduct made criminal by state statute . . . $15 for each misdemeanor charge." But the district court is statutorily mandated to waive the surcharge if it "determines under 46-18-231 . . . that the person is not able to pay the fine and costs or that the person is unable to pay within a reasonable time." Section 46-18-236(2), MCA. A district court's failure to conduct such an inquiry is contradictory to statute, which requires the sentencing judge to "take into account . . . the financial resources of the offender" before imposing a fine. Section 46-18-231(3), MCA.

¶9     It is undisputed that the District Court made no inquiry into Post's ability to pay fines, fees, costs, or surcharges during sentencing. Despite being advised Post had "limited income" and was "on disability and social security," the District Court asked no further questions and opted to impose a sentence that appeared to be premised upon deterring forum shopping. Consequently, while the fine itself was within statutory parameters, the District Court's imposition of the fine absent an ability to pay analysis was impermissible. Likewise, the District Court was required to determine if Post would be able to pay the statutory surcharges for each misdemeanor offense and, if not, to waive the surcharges. Section 46-18-236(2), MCA. Because no ability to pay inquiry was made, we cannot conclude the District Court's decision to impose surcharges was appropriate.

¶10     For the foregoing reasons, we reverse and remand for a new sentencing hearing in conformity with this Opinion.

/S/ JIM RICE

6

We Concur:

/S/ CORY J. SWANSON
/S/ KATHERINE M BIDEGARAY
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON


Justice Laurie McKinnon, concurring.

¶11 Pursuant to Montana's statutory scheme that establishes a statewide public defender system and statutory rules for determining indigency, Post has already been determined to be indigent by the OPD. Therefore, I suggest, in the absence of information to the contrary, trial courts should be able to rely on the OPD's indigency determination as a factor when deciding whether a person has the ability to pay fines, fees, and costs. While there is a clear statutory duty on the court not to impose these financial obligations when a person is indigent, absent any information offered by the parties which may reasonably bear upon the defendant's ability to afford private counsel and pay fines and fees, the OPD's determination that the statutory indigency factors of § 47-1-111(3), MCA, have been met and its unrescinded decision to represent a defendant can be relied on by trial courts in making a determination a defendant does not have the ability to pay fines, costs, and fees.

¶12 The application for public defender services considers monthly employment income; other household member employment; other childcare income for the household such as Social Security, Social Security Disability, Worker's Compensation, Unemployment and Veteran's Benefits; assets; real estate; motor vehicles; ATVs; boats; trailers; monthly expenses such as housing, utilities, food, childcare, gas, vehicle and

7

student loans, insurance payments, medical expenses, court fees and restitution imposed in other cases, and credit card expenses. *See* Montana State Public Defender Application, https://perma.cc/RR7S-DBEK. I doubt that a court can or ought to consider such extensive and confidential financial information in a public proceeding which will inevitably involve not only the defendant's confidential financial information, but confidential financial information of the defendant's entire family and household. Indeed, a small portion of this financial information is contained within the Presentence Investigation report which is kept in the court file under seal and marked "Confidential." Thus, it appears to me, there is no point in taking further testimony on a defendant's financial status to determine his or her ability to pay once the OPD has conducted its inquiry and has continued with its representation of the defendant, unless information is offered that refutes the accuracy of the OPD's indigency determination or establishes that the defendant's economic status has changed.

¶13   In many states, the initial determination of indigency is made by the court. *See, e.g.,* Wash. Rev. Code § 10.101.020 ("The court or its designee shall determine whether the person is indigent[.]"); Alaska Stat. § 18.855.120 ("The determination of a person's indigency shall be made by the court in which an action against the person is pending."); Cal. Gov't Code § 27707 ("The court in which the proceeding is pending may make the final determination in each case as to whether a defendant . . . is financially able to employ counsel and qualifies for the services of the public defender."). However, in Montana, "if the defendant desires appointed counsel [and the offense qualifies for appointment of assigned counsel] . . . the court shall order the office of the state public defender, provided

for in 2-15-1029, to assign counsel to represent the defendant without unnecessary delay pending a determination of eligibility under the provisions of 47-1-111." Section 46-8-101(2), MCA. Thus, the OPD makes the initial determination of indigency, not the court. Consistent with this framework, § 47-1-111(1)(a), MCA, provides that "[w]hen a court orders the office to assign counsel to an applicant for public defender services, the office shall immediately assign counsel prior to a determination under this section." If the "person for whom counsel has been assigned is later determined pursuant to this section to be ineligible for public defender services, the office shall immediately file a motion to rescind appointment so that the court's order may be rescinded." Section 47-1-111(1)(b), MCA.

¶14 The OPD must apply the statutory indigency factors set forth in § 47-1-111(3)-(5), MCA. They provide:

An applicant is indigent if:

(a) the applicant's gross household income is at or less than 133% of the poverty level set according to the most current federal poverty guidelines updated periodically in the Federal Register by the United States department of health and human services under the authority of 42 U.S.C. 9902(2); or
(b) the disposable income and assets of the applicant and the members of the applicant's household are insufficient to retain competent private counsel without substantial hardship to the applicant or the members of the applicant's household.

Section 47-1-111(3), MCA. An applicant for public defender services must provide a "detailed financial statement and sign an affidavit[,]" and the judge "shall advise the defendant that the defendant is subject to criminal charges for any false statement on the financial statement." Section 47-1-111(2)(a), MCA. A determination of indigency by the

9

office may be "modified by the office or the court if additional information becomes available or if the applicant's financial circumstances change." Section 47-1-111(5), MCA. A determination of indigency "may not be denied based solely on an applicant's ability to post bail or solely because the applicant is employed." Section 47-1-111(4), MCA.

¶15 In furtherance of these statutory provisions, the OPD has established Administrative Policy 105. https://perma.cc/L9QQ-Q37A. The OPD considers the income and assets of a defendant's household, defined as "an association of persons who live in the same dwelling, sharing its furnishings, facilities, accommodations, and expenses." OPD Policy 105, § 1.3(2). Eligibility for assignment of counsel is *presumed*[1] if an applicant is a "current verified or documented recipient of a state or federally administered public assistance program such as TANF, SNAP, or SSI[.]" OPD Policy 105, § 4.2(2)(1). The OPD's policy provides for "hardship eligibility" for appointment of counsel when an applicant cannot retain competent private counsel "without creating a substantial financial hardship to the applicant's household" upon "a verification and evaluation of an applicant's supporting documentation, such as real property ownership, paystubs, bank statements, unemployment status, public benefit status (EBT/SNAP/TANF/SSI/SSDI/etc. . .),

---

[1] The OPD possesses the burden to determine an applicant's eligibility for the services of a public defender and, when certain criteria are met, the applicant has a presumption of eligibility for a public defender. This Concurrence does not advocate for such a presumption of inability to pay once the OPD criteria is met, rather I merely suggest courts rely on the work *already done* when considering a criminal defendant's ability to pay. The Chief Justice's Concurrence obviously mischaracterizes or misreads this suggestion. Concurrence, ¶ 20. A good-faith reading of this anodyne Concurrence would reveal an effort to save courts from redundant efforts to build a record already assembled by the OPD.

10

worker's compensation, pension or retirement benefits, financial aid benefits, and/or other documentation, and/or other documentation requested," as well as a consideration of "an applicant's disposable household income (gross household income less reasonable and necessary expenses), extent and liquidity of assets, together with consideration of the severity of crime(s) charged, incarceration status, and the estimated cost of retaining private counsel." OPD Policy 105, § 4.2(5). The OPD "shall review an application for completeness, ensure the application is signed by the applicant, and make reasonable efforts to follow-up with applicants to obtain additional information or documentation necessary to determine the applicant's eligibility for public defender services." OPD Policy 105, § 3.2. If a defendant does not presumptively qualify for assignment, then the OPD will determine eligibility based on the federal poverty guideline level. OPD Policy 105, §4.2(2); *see* Federal Poverty Guidelines, https://perma.cc/7CQM-ZM5B. Hence, the process by which the OPD determines that a defendant is or is not eligible for representation is extensive, thorough, and beyond what could be effectively conducted during a sentencing hearing.

¶16 Despite the extensive and thorough examination of a defendant's economic status by the OPD, the OPD's determination that a defendant is indigent is not binding on the court. *State v. Gable*, 2015 MT 200, ¶ 13, 380 Mont. 101, 354 P.3d 566. The OPD's decision regarding representation does not bind a court in its statutory obligation to consider a defendant's ability to pay. However, I would offer that a trial court's acknowledgment that it relied on the fact that a defendant was represented by the OPD in determining an inability to pay or that the defendant received government assistance, when

there has been no information offered by the parties which may reasonably bear upon the defendant's ability to afford private counsel and pay fines and fees, would satisfy the court's statutory obligation to consider a defendant's ability to pay. Concomitantly, if a defendant is represented by the OPD or on government assistance and the court imposes costs and fees, there should be information in the record regarding *specific assets* that bear on the defendant's ability to afford counsel and pay the financial obligations imposed. This would avoid the absurd result reached by this Court in *State v. Ingram*, 2020 MT 327, 402 Mont. 374, 478 P.3d 799, wherein we held that even though Ingram's *only* source of income was Social Security Disability, we could avoid the anti-attachment provisions of 42 U.S.C. § 407(a) ("none of the moneys paid or payable . . . under [the Social Security Act] shall be subject to execution, levy, attachment, garnishment, or other legal process . . .") by simply not mentioning the benefits during sentencing or in the judgment as a source from which the mandatory fine could be paid. *Ingram*, ¶ 11; s*ee Bennett v. Arkansas*, 485 U.S. 395, 398, 108 S. Ct. 1204, 1206 (1988) (holding that "the express language of § 407 and the clear intent of Congress that Social Security benefits not be attachable" as reimbursement for state welfare assistance programs); *Philpott v. Essex Cnty. Welfare Bd.*, 409 U.S. 413, 417, 93 S. Ct. 590, 592 (1973) (holding that § 407 "imposes a broad bar against the use of any legal process to reach all [S]ocial [S]ecurity benefits"); and *Wash. State Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 383, 123 S. Ct. 1017, 1024 (2003) ("execution," "levy," "attachment," or "other legal process" are "terms of art refer[ing] to formal procedures by which one person gains a degree of control over property otherwise subject to the control of another, and generally

12

involve some form of judicial authorization.") Fortunately, our precedent has been corrected, and a trial court now must always consider an ability to pay, even with mandatory fines. *See State v. Gibbons*, 2024 MT 63, ¶ 64, 416 Mont. 1, 545 P.3d 686. We no longer must maintain the façade that a person whose only source of income is government benefits will not be forced to pay a fine (or risk revocation) if we simply look the other way, do not orally mention it, and do not write it.

¶17 One of the costs imposed here is the cost of assigned counsel. However, the Legislature has likewise mandated that costs of assigned counsel, even the reduced costs set forth in § 46-8-113(1), MCA, may not be imposed on a defendant who does not have the ability to pay them. Section 46-8-113(4), MCA ("The court may not sentence a defendant to pay the costs for assigned counsel unless the defendant is or will be able to pay the costs imposed by subsection (1) [reduced fees for misdemeanor and felony cases].). I would be remiss if I did not mention that the recoupment statute for costs of assigned counsel, § 46-8-113, MCA, should be considered differently from other cost recoupment statutes because of the underlying fundamental right to counsel which is implicated. Section 46-8-113, MCA, requires that a court determine whether a convicted defendant should pay the costs of assigned counsel and provides an incentive to plead guilty rather than go to trial by reducing attorney fee costs that may be imposed if the defendant pleads guilty prior to trial. Incentivizing an indigent defendant to plead guilty by reducing a financial obligation poses a potential chilling effect on a defendant's fundamental right to trial. An indigent defendant who cannot afford the costs of going to trial may forego trial, even if the better outcome might be to resolve it through trial. Likewise, the imposition of

13

attorney fees upon an indigent defendant poses a potential chilling effect to a defendant's fundamental right to counsel. An indigent defendant who cannot afford the costs of counsel may forego counsel, which any stakeholder in the judicial process understands is usually not in the defendant's best interest. *See State v. Moore*, 2012 MT 95, ¶ 18, 365 Mont. 13, 277 P.3d 1212 ("To require a defendant to pay costs of a jury trial poses a potential chilling effect on an indigent defendant. A defendant who cannot afford the potential costs associated with a criminal jury trial may forego a jury trial, even if a jury trial would be in a defendant's best interest.") While neither argument is raised in this case, the draconian practice of imposing economic sanctions on an indigent person exercising their fundamental rights cannot be ignored.[2] At a minimum, courts must scrupulously and

---

[2] The Chief Justice's Concurrence further faults this supplemental writing for straying "beyond the issues necessary to resolve this case." Concurrence, ¶¶ 25-26. But this critique misapprehends the unique role concurring and dissenting opinions play in appellate decision making. They may seek a change in the law, encourage legislative action, highlight discrepancies in the law that should be addressed, or provide persuasive authority for future appeals. Thus, a dissent or concurrence inherently is not restricted to the arguments made by the parties. Moreover, our precedent is rich with examples of when a dissent or concurrence has espoused a position not advanced in the trial court or on appeal. *See Planned Parenthood v. State*, 2024 MT 228, ¶¶ 70-71, 418 Mont. 253, 557 P.3d 440 (Rice, J., dissenting) (discussing the "virtually limitless benefit" of "human 'capital'" provided to society by "[w]omen who choose to carry their pregnancies to term[.]"); *see also Mont. Env't Info Ctr. v. Gov.*, 2025 MT 112, ¶¶ 67-77, 422 Mont. 136, 569 P.3d 555 (Rice, J., and Swanson, C.J., dissenting) (discussing sua sponte cases about fines, fees, elapsed time, credit for time served, preliminary injunctions, and the private attorney general doctrine in a case involving attorney fees for vindicating the right to know.); *see also MEIC*, ¶ 87 (Swanson, C.J., dissenting) ("I commend [Justice Rice's dissent] as a healthy and unflinching self-evaluation of this Court's performance" despite none of the parties requesting such an audit); *see also Planned Parenthood of Mont. v. State*, 2024 MT 178, ¶ 62, 417 Mont, 457, 554 P.3d 153 (Rice, J., specially concurring) (creating a class for purposes of an equal protection analysis that was neither advanced or argued by the parties: "[r]ather, the proper distinction created by the Consent Act is between minors seeking an abortion and adults seeking an abortion. In brief, the distinction is one of age."); *see also State v. Schultz*, 2025 MT 142, ¶ 23, 422 Mont. 504, 571 P.3d 685 (Swanson, C.J., specially concurring) (discussing sua sponte the rule of lenity and noting that "our caselaw has not been a model of clarity on this point."). These are but a few examples of a dissent or concurrence not premised upon an argument made by a party. Nonetheless, they

meticulously identify specific assets that warrant a departure from the statutory indigency factors set forth in § 47-1-111(3)-(5), MCA. Here, a court may consider that the OPD represents a defendant, a determination which was based on statutory indigency factors, absent some information that the OPD determination was or is presently incorrect.

¶18 With the aforesaid qualifications, and because it is the court's statutory obligation to determine a defendant's ability to pay, I would remand for such a hearing to occur. However, I would suggest that the court may rely on the indigency determination made by the OPD when there is no information offered by the parties which reasonably bears upon the defendant's ability to afford private counsel and pay fines and fees. The reliance should be so stated for the record, such that upon review by this Court, it is clear that the trial court has considered a defendant's ability to pay.

/S/ LAURIE McKINNON

Justice Ingrid Gustafson joins in the concurring Opinion of Justice Laurie McKinnon.

/S/ INGRID GUSTAFSON

---

serve at least as one jurist's attempt to shape judicial precedent or speak to an audience other than his or her colleagues. When this Court issues its majority opinion, we settle the specific question before us, but those questions do not exist in a vacuum. The use of concurrences and dissents to help shape the law is an integral part of judicial decision making.

15

Chief Justice Cory J. Swanson, concurring.

¶19 I concur with the Opinion. The imposition of a $3,000 fine for a Third Offense DUI made it a discretionary fine and therefore the sentencing court was required to inquire into Post's present or future ability to pay. Opinion, ¶ 9.

¶20 I write separately to respond to Justice McKinnon's Concurrence. I am concerned the Concurrence in effect creates a presumption against a defendant's ability to pay when OPD determines the defendant is indigent, and it creates a new burden on the court to overcome this presumption. McKinnon, J., Concurrence, ¶ 16. None of this was briefed or argued by either of the parties. Instead, the Concurrence is issued sua sponte, and well beyond the issues necessary to resolve this case. It therefore carries an inherent risk of inaccuracy due to an undeveloped record and lack of adversarial argument by the parties.

¶21 The OPD determination of a defendant's indigent status is a necessary screening to determine whether a person is entitled to representation at the public's expense. It can be one factor, maybe even a significant one, to be considered by a court. But it does not comprise the entire scope of a court's analysis to determine whether a defendant can pay fines, fees, or restitution.

¶22 And it certainly is not dispositive to the question of whether a court should order a defendant to pay a minimal amount to reimburse the office of public defender for representation in a case. Retaining private counsel for a criminal defense is expensive. It costs several thousand dollars for a misdemeanor trial, and many thousands to defend a felony trial. A statute authorizing up to $250 reimbursement for a misdemeanor and up to

$800 for a felony is nowhere near the total cost of counsel.  Section 46-8-113(1)(a)(i)–(ii), MCA.

¶23    Further, charging additional legal fees for a criminal case which goes to trial is commonplace among attorneys in Montana, and across this nation in every legal market. A trial requires significantly more time and preparation than a plea deal.  We have never held the current statutory fee structure is unconstitutional, nor has the United States Supreme Court held incentives in the plea-bargaining system unconstitutional.  *See Brady v. United States*, 397 U.S. 742, 751, 90 S. Ct. 1463, 1470 (1970) (declining to hold a guilty plea "is compelled and invalid under the Fifth Amendment whenever motivated by the defendant's desire to accept the certainty or probability of a lesser penalty rather than face a wider range of possibilities extending from acquittal to conviction and a higher penalty authorized by law for the crime charged").

¶24    The wisdom of providing incentives to plead out your case is subject to lively debate among scholars.  *Compare, e.g.*, John H. Langbein, Torture and Plea Bargaining, 46 U. Chi. L. Rev. 3, 12–19 (1978) (plea bargaining is similar to medieval European torture), *and* Stephen J. Schulhofer, Plea Bargaining as Disaster, 101 Yale L.J. 1979, 1980 (1992), *with* Frank H. Easterbrook, Plea Bargaining as Compromise, 101 Yale L.J. 1969, 1978 (1992) (plea bargaining is a compromise which maintains defendant's autonomy). Ultimately, the chilling effect created by plea bargaining incentives is a question of policy, best left to the Legislature.  The legality or constitutionality of the fee structure is not an issue for the Court to consider in this case.

¶25 As acknowledged by Justice McKinnon's Concurrence, neither of these arguments are raised by the parties. McKinnon, J., Concurrence, ¶ 17. Why should a member of this Court therefore raise them gratuitously? There is a clear appearance of anticipatory activism at play here. One could argue these issues are being raised to indicate future statutory targets to overrule and strike down. The Concurrence could therefore be seen as an invitation to creative defense counsel to raise arguments attacking these statutes, as well as an indication the Court would be receptive to those future arguments.

¶26 This Court may sometimes stray outside the four corners of the brief to resolve the issues presented on appeal. But we should not preemptively signal legal or policy positions on issues not presented in a case. To do so indicates a judicial desire to actively shape the law by recruiting cases and arguments to our arena. This is contrary to our constitutional nature and function. To modify a phrase from Mr. Adams, this Court does not go abroad, in search of statutes to destroy.[1]

/S/ CORY J. SWANSON

Justice Jim Rice joins the Concurrence of Chief Justice Cory J. Swanson.

/S/ JIM RICE

---

[1] "But [America] goes not abroad, in search of monsters to destroy." John Quincy Adams, *Speech to the U.S. House of Representatives on Foreign Policy* (July 4, 1821), https://perma.cc/RH58-89NC.